Ariosa Diagnostics v. Verinata Health. Okay, we're going to shift gears now, Mr. Lemley, whenever you're ready. May it please the Court. Given the setting, would it be helpful for me to start with a brief recitation of the facts? Sure, why don't you do it. So let me, both- And completely neutral and fair, right? Absolutely, absolutely. Both parties in this case, Your Honor, provide genetic tests for aneuploidy, also known as Down syndrome. Now that's not the invention. That was well established in Dotland. They use for this test cell-free fetal DNA. So while prior tests had required amniocentesis and a large needle to be inserted into the womb, cell-free fetal DNA dispenses with the need for that. That, too, is not the alleged invention here. That also is taught in Dotland. The patent claims that you can take these samples from a variety of sources and combine them together. Now that was taught in part in Shoemaker. Shoemaker teaches that you can index and tag samples from various different sources. But in Shoemaker, all of those sources are from the same person. So the alleged point of novelty in this case- And they're actually cells. And in Shoemaker, they are also cells. That's right. In Dotland, they are cell-free fetal DNA. The alleged point of novelty in this case is the use of multiple patients' samples in the same testing, so-called multiplexing. Now what we offered before the Board was both evidence of a specific third reference, the Bin Laden reference, which taught multiplexing, but we also offered a description of the state-of-the-art, which demonstrated that multiplexing was well-known and that there were indeed products already commercially available for sale, such as the Illumina gene sequencing system, that did multiplexing. So we think the first error the Board made here was in ignoring that evidence of state-of-the-art. And the question is- Mr. Lemley, in your blue brief at 30, you say the Board recognized that the prior art references in combination satisfied all the claim limitations, and you quote JA-16. I looked and looked, can't find it. Where do they say we recognize that the prior art references in combination satisfied all the- Your Honor, they say it with some equivocation. So at A11, they cite the references and the motivation to combine all of those references. In addition, Petitioner provides a claim chart detailing where various elements of the challenge claims can be found in Shoemaker, Dallin, and Bin Laden. And for each element or cause of the claims, claim chart purportedly identifies where some aspect of that element or cause is disclosed. Now, purportedly is, of course, the magic word there. But there is no finding in the Board at any time that any- that there's any part of the claim that is not taught in one of these three references. So you're saying that's how they recognize it? They recognize it there. They then go on to discuss it, I think, in the combination in A15 and A16. All of this Board's discussion is premised on the assumption that all of the elements individually are present. There is certainly no Board finding that any of the elements is absent. The only thing that's absent is the combination in one single reference. And so I think this is a classic- But let me say, I mean, I take it that the gist of the Board's decision is that what is absent is a understandable explanation of why the hypothetical relevant skilled artisan would have been motivated to take these pieces from different prior art, shed some of what those pieces of prior art taught. We're not going to do distinguishing the fetal from the maternal samples anymore. All with a reasonable expectation of success. And in a proceeding, in a forum in which speed is an imperative, you have got to put that explanation, the connective tissue, into the petition and can't rely on kind of two-level-down pieces of evidence submitted in the record. Understood, Your Honor. I mean, I think one of the difficulties here is that the Board has sort of shifted its ground in practice as to whether it wants the claim charts in the petition itself, as it did at the time, or whether it now wants them attached. We did, in fact, in the record at 209, specifically give the motivation to combine references in the petition. And we then referred to the expressed discussions of those motivations in the Nussbaum Declaration and the Morton Declaration. The Board was well aware of this. This was not an area, a case in which they simply failed to find it. The Board at A11- I'm sorry, can I ask you- Certainly, Your Honor. The 209 is the six lines before the claim chart starts? That's correct. But all that says is that Nussbaum and Morton explained in their declarations that a skilled artisan would also have readily understood that shoemakers' methods could be carried out. Could is not I would. So that is correct, Your Honor. But I think understanding the skilled artisan, that they could carry it out, right, is the very thing the Board ultimately decides is missing here. The Board never says there's no motivation to combine. The Board says we don't know how you would combine. In fact, the Board itself quotes at length- Right, but suppose I read that to mean- The Board used language that had a certain element of frustration. That is, you're making us do far too much work. And when it said you're not showing up, you agree that changes would have to be made in particular pieces you point to and to combine. You haven't explained how all of this would be understood by a relevant skilled artisan. And maybe I'm now adding something, but I took implicitly, you were saying, or therefore why somebody would want to do that. Well, I think we did very clearly explain in the Nussbaum Declaration why someone would want to do it. And the Board understood that, and they quoted it at length in their decision at A-11. As to the motivation to combine, Dr. Nussbaum said, I believe one of skill in the art would have been motivated to combine these techniques as the combination would clearly result in an enhanced productivity and increased throughput of sample analysis. The sequencing and multiplexing technology of Bin Laden would have made the procedures of Shoemaker and Dahlin less expensive, faster, and more efficient, because one could sequence index samples from many different patients in a single sequencing run. That is precisely the sort of motivation, intrinsic, improve the operation of the science that KSR recognizes. Can I ask you, this is shifting gears a little bit, and one form of the question is why didn't you argue? So there are the two Chu references. Mid-2008, or end of 2008, December 2008, and then June of 2009. They could not be clearer, I think, in describing conceptually the counting process that is described and claimed in this 430 patent. And at least the second one, probably even the first one, and they refer to the Illumina genome analyzer. The second one, at least, is even after the genome indexing kit brochure. And yet, there is no obviousness case presented based on Chu. Your Honor. Can you explain? I was not counsel before the board, but my understanding... Second answer. But my understanding of the rationale is that, excuse me, the counsel before the board wanted to focus on prior art references that were not cited on the face of the patent because they believed the board was more likely to pay attention to those references. That said... That's a kind of strategic consideration. Exactly. No, that's right. And so we are not relying on Chu here as a prior art reference. That said, in your list of why didn't you mention questions then, you have a heading at 25, the board erred in ignoring evidence of the background knowledge regarding the Illumina genome analyzer. A person of ordinary skill would have with respect to DNA indexing. Apart from a brief mention of the Illumina brochure in your expert's declaration, that argument seems to me to be raised for the first time in your reply brief to the board. Absolutely not, Your Honor. Okay. Show me where. First, it is raised in the petition itself, 178 and 179. We have a whole section of the background on the art, and that section on 179 explains that multiplexed massively parallel sequencing of a pooled sample, which is precisely what we're talking about from Illumina, e.g. efficiently sequencing a mixed or pooled sample containing the DNA fragments from several different individuals after indexing the DNA fragments from each individual, were also well known and in widespread use as of 2010. That then refers to both the Nussbaum and the Morton declarations, which specifically call out the Illumina system. They are attached and submitted to the board with the petition. In fact, the Illumina system is mentioned not once but twice in the 430 patent itself as background art. And in the institution decision, the board itself specifically acknowledges that the Illumina gene analyzer is present and that it is taught in Shoemaker as a reference. So there is, I think, no reasonable way to conclude that this was raised for the first time. What did happen, I think, is that, quite frankly, this was, in our view, background. Everybody knew that you could, in fact, multiplex. And people had been doing it, that there were commercial products designed precisely to do it. And it was only when Veronata, to our view somewhat oddly, decided to make that their stand in opposing the obviousness case that we then discussed it in more detail. But the Illumina evidence is presented as the state of the art, as background art. And the board chose to give it, quote, no weight because it wasn't identified as a separate prior art reference but instead only in the state of the art. That is directly contrary to this court's decision in Randall v. Ray. Can I return? I know how Randall works. So can I return you to the Chu question? Yes, Your Honor. Suppose you were to try to tell me right now what's missing with respect to the 430 in at least the combination of the two Chu references. I don't know that there is anything missing, Your Honor. But, I mean, I think the thing What's odd here, and I kind of infer that this is what the board thought was odd, was that you were making an argument based on prior art references that were substantially different methods. The one with the cells, the one with the allele-based method, in each of which there was an effort, a required effort, to distinguish stuff from the fetus and stuff from the mother. And everybody kind of knew that, I guess, back in the old days of Dahlin, prehistoric times, nobody was quite sure what the ratio of the fetal DNA was compared to the maternal DNA in the plasma. And until you knew that ratio, total counting would give you gibberish as information. But by 2008, everybody knew, Chu says, very small, very small. And so you needed a large, large statistical sample for the counting to give you a meaningful difference. By 2008, or at least by early 2000, by January 2010, there were ways of getting those large samples, and Chu seems to suggest that. And I think the board was thinking, why are you starting from this bizarre place of radically different techniques? And picking pieces. Your Honor, I mean, as I said earlier, I think the decision to choose these references was a decision based on the fact that they were not cited on the face of the patent. But I would suggest that the fact that there are, as I believe there are, other references that also render the Veronata patent obvious can't be used as a basis to defend the board's decision. Unless the fact that the references that quite specifically discuss the actual counting technique being used here by not being cited and communicate, there was actually something missing in a skilled artisan's understanding of whether that technique, the actual technique, not the Dahlen technique or the Shoemaker technique, which are meaningfully different, could be used with the reliability implicit in prenatal testing. So, Your Honor, let me suggest that there is absolutely nothing in the board's opinion that suggests that that is their conclusion. There is no discussion of the references that you're talking about. There is no discussion of the counting issue at all. There is no discussion in Veronata's briefing or, frankly, at all in the board below on that issue. And I think this leads me to the Chenery point. If, in fact, it is the case that the board could have come to a conclusion like that but didn't put it on the record, that itself is independent grounds for remand. This court and the Supreme Court in Chenery have made it very clear that the board's obligation under the Administrative Procedure Act is to set out in detail the factual findings they are making. Right, and it's possible, at least, and I know you're not prepared to concede this, but that if the matter went back to the board, that the board could say, our procedures are such that it is important that we insist on certain levels of explanation in the petition, and we're not going to give you an opportunity to make new arguments. We're just going to make new findings. I think that is entirely possible, Your Honor, and if that happens on remand, we will deal with that on remand. But I think that is not an argument for affirmance. One of the things that this court has made absolutely clear, most recently in the power integrations case decided after the briefing was completed, is that this is not something for the court to decide. This is something that the board has to articulate in the first instance. It can't be supported on independent grounds, as Veronata repeatedly tries to do. That is simply not the law. The law, in fact, says quite the opposite. What this court said in power integrations is, as a general proposition, a review of a patentability determination is confined to the grounds on which the board actually relied. We have no warrant to accept appellate counsel's post hoc rationalizations for agency action. Now, it may be on remand that the board says there's just not enough here, and we pick apart the motivation, we pick apart the ability to combine, although, honestly, there is nothing in the board's decision now that suggests there isn't a motivation to combine, except the absence of plug-and-play compatibility between Dahlin and Bin Laden. And this court made quite clear in the Moutet case that that's not the legal standard. You don't ask, can I actually plug these references together and make them work? You ask, once people understand the knowledge in each of these references, do they have the motivation to put these things together, and if they have that motivation, would they reasonably have an expectation of success? Over my time, Your Honor. Thank you. We'll restore three minutes of rebuttal. May I just say, just generally, when I appeared in front of the Judiciary Committee for some reason, they asked me specifically if I would promise to wear my hearing aid. I do, so you don't have to talk quite so loud. I apologize, Your Honor. Mr. Reines, good morning. Edward Reines, may it please the Court. The reason why the priori combination is so terrible is because this was such an emerging area. It's not an old area for investigation. It's emerging even as we speak. And the choices of art are not good because it's going in dissonant directions. But Chew, I mean, I realize they didn't make anything of Chew, but I'm very puzzled and I would love to have some of that puzzlement be unraveled this morning. I'm here to feed and address your curiosity. Chew is random DNA sequencing with an Illumina sequencer. No one is saying that knowing how to do DNA sequencing is the invention, or even that counting is the invention. A couple of the innovations, this is a synergistic set of innovations. The characterization of the innovation as being merely multiplexing is a cartoon. I mean, it can't be serious. One of the things they do is they reduce the sequencing. Instead of doing a whole genome sequencing like Chew, where you would sequence everything, you get all your data for all 21 chromosomes, and then you go and you match it to the genome with the standard sequence alignment, and you figure out how much 21 you have and then how much of a control you have. That's kind of along the Chew lines. They do something here which is called selective enrichment, where all they sequence is 21 and a control, let's say 20, just as an example. That is innovative because you're not sequencing all the other chromosomes. The cost of that is potential distortions because whenever you enrich, it's not perfect. There's biases in the amplification and otherwise. When you sequence everything, you're doing that much more sequencing, 20 times the sequencing, but you don't have those errors. So to make the decision to do selective enrichment is itself a very clever idea. None of the references show that. Combining that idea with using cell-free and doing the counting, where you have to be so exact because there's only 10 percent fetal DNA in the cell-free region. I'm sorry. I thought I was remembering that selective enrichment appears in some of the prior art, maybe discussed as a way of selectively enriching those DNAs that one knows are more likely to be fetal than maternal. You got it. You're impressive in your knowledge of this technology. Is that a different kind of selective enrichment? It's completely different. That is the old – there's so many big gulfs in these different approaches, right? Cell-versus-cell-free is huge, different bodies. People have been trying the cell approach forever. In the 1990s, in a case that's before this court on the 101 issue, Dennis Lowe came up with the idea of looking at the cell-free region. That's the 101 issue that's big on that case. So he came up with let's look at the cell-free. That's a huge body divide there. Then within looking at the cell-free region, they spent 10 years just trying to get looking at the fetal and separating the fetal out, with no success at all. And they continue, people continue to try to distinguish because if you can just get the fetal DNA, look how efficient it would be. So the selective enrichment that you're recalling is the kind of the allele in the cell-based in Shoemaker where you're just trying to get just the fetal DNA. It's completely different than saying I'm going to do this, consider the maternal and the fetal. And I think the beginning and the end of their prior art theory is in Morton's deposition. It's not even her deposition, her report. It was one of those things, I'm not sure it was the wisest thing for them to put in from a tactical perspective, but she said grouping the maternal and fetal DNA together and trying to figure it out from there is a completely different problem from all the art that she just described, including their own art. And the board relied on that. This combination of prior art is terrible. I mean they've got one person doing cell. They've got Dahlin, which is trying to minimize DNA sequencing. What Dahlin wants to do is say don't do a lot of DNA sequencing. So why would you go to massive DNA sequencing like they're trying? But Mr. Lemley says, and tell me if this is wrong, that when you look to see what concrete problem of combination the board identified as not sufficiently established, the only one it talked about was the use of some of the amplification techniques. And that's a problem if, as the board did, it gave, on page A19, gave short shrift, a highly informal term, to exhibit 1010, the aluminum brochure. Why do we not take the board's decision on its own terms, that it didn't identify with much concreteness or at all any other reasons to be uncertain about the picking and choosing of elements from these pieces of prior art? I think the frustration they had, which Your Honor described earlier, of how would you even begin to pick and choose, even in this motivation, this four lines, it's conclusory. It says you take techniques from one and techniques from the other. What techniques from them? It doesn't describe anything about the techniques. With respect to 1010, the thing I want to add about 1010, because I think this is important, is with respect to 1010, they mentioned 1010 once in their discussion of the art to state that the Patent Office had granted over 1010. This is on page 179. The only reference is that the four lines from the bottom is that the Patent Office considered it and rejected it. That's their reference to 1010. Importantly, and there's an important point of procedure here, to even begin to think to remand this, because the board did an exemplary version. They said you've given no theory how you pick from these disparate, conflicting references and put it together. How could that burden possibly be shifted to the board? That would just be unkind. But if you go to 174, what they say on- I don't remember that provision of the APA. No, but just, I mean, common sense. But if you go to 174, which is the beginning of their description and their petition that they control with their high-powered legal team and all that good stuff. What page did you cite? A174. 174, yeah. They cite the regulation of the board at the last sentence, and they say the exhibit numbers of the supporting evidence relied upon to support the challenges and the relevance of the evidence to the challenges raised, including identifying specific portions of the evidence that support the challenges, are provided in Section 7 below, which is not the discussion in Section 5. And even in Section 5, 1010 isn't even cited by exhibit number. It's just they say, oh, during prosecution history, it was granted over a 2008 Illumina publication, which happens to be it. And the thing, and this picks up on what Judge Wallach said, is, well, the first time they really raised 1010 was in the IPR reply. Wrong. That's what everyone on the team thought. I read the IPR reply. It's not in there. They doubled down on this three-ring circus of Dahlen, Bin Laden, and Schumacher in the IPR reply. They don't say, oh, wait, we've got 1010. You're forgetting 1010. How can you expect the board to take that kind of thing seriously? Now, on top of all that, the statement that they didn't consider 1010 is wrong. Professor Lemley didn't get that quite right. What they said is they were not going to tolerate a reply declaration after we put in all our submissions that attempted to substitute 1010 for Dahlen or for whatever they were trying to substitute it for. And all they said is there's only two paragraphs of the Morton reply declaration that they weren't going to consider. That's all they said. They did not say they weren't considering 1010. This is completely different from the Randall case, about which you know everything because you wrote it. Because in that case, one of the conclusions was it wasn't going to be inconsistent with the combination. Keep in mind, let's not give the board, you know, it's a long opinion, and it's well-reasoned that the multiplexing that's referred to is Bin Laden. They say Bin Laden's the state of the art. Now they want to say 1010, but they said time and again, Bin Laden is the best art reference on multiplexing for tagging. It would not work with any of our approaches because it's five-prime tagging. So is Shoemaker. In their reply brief, they're trying to say, well, there's no specific rejection of Shoemaker. Shoemaker works the same way. They label it the five-prime end. That wouldn't work. It's another clash between their references. I mean, I guess I take it that the gist of the criticism of the board's treatment of 1010 and the general issue is something like this. The only specific thing that the board focused on, as missing from the explanation, as opposed to the general characterization, you just haven't really given us much explanation about how to combine these things, is about the amplification techniques, including the whole set of amplification techniques, including the indexing and from using multiple sources and whatnot. And that really is a matter of background knowledge by the time January 2010 comes. There's really no dispute about that. I'm characterizing my understanding of their argument. There's really no dispute about that. A variety of these sources, including the petition, mention a variety of amplification techniques. There's at least indirect reference to the Illumina system using multiple sources, doing it with the multiplexing. And that just wasn't taken seriously by the board when the only specific omission that the board focused on was all about that. I mean, I have so many problems with that because what the board focused on was their own admission that the technical challenge presented by this is different than the references. Morton made that admission. There's no reason you do all these combinations. How does the board have the board saying, what are we supposed to knock down? What are you taking from Schumacher? What are you dropping? The point, Your Honor, you know that. You asked the question originally. What do you actually, even in their reply brief and their appeal, they still never tell you, where do you get in selective enrichment that you're only sequencing two chromosomes or you're doing a chromosome comparison? Where do you even get that? And with respect to multiplexing, Dahlin eschews multiplexing. By the way, the idea that they made this as a tactical decision through craftiness because they wanted the void side to prioritize. Dahlin, the central reference on fetal aneuploidy analysis, is cited right on the cover of the patent. And there's a version of Schumacher that's on there too for even more. So that doesn't work. So can you just get back to something I think I interrupted your answer to? What's missing from the two CHU references? In CHU, what you're doing is you're sequencing everything in the genome, all the chromosomes. Really? There's no focus on either particular chromosomes or particular chromosomes? It's back end. I'm not sure what that means. I'm sorry. This goes back to the explanation I had before, which is you go through the sequencing process, you get all the information, and then you compare it against the whole genome in the sequencing alignment. And this, you do 20 less. So you're feeling bad that you might be letting an invalid patent slip through. I don't think should be any concern. This patent is incredibly different. It pulls together disparate concepts. The prior art is so different because there's not good prior art out there. I mean, that's what this shows. And to blame the board for saying, we don't even know what they're saying. And, in fact, I mean, their whole statement of motivation is one sentence in their petition. That's superficial and doesn't tell you. It says, well, you can combine these techniques from these three references. What techniques? And to expect the board to, like, parse that down? And with respect to your statement, Your Honor, bin Laden was selected purely for saying how you do the tagging. I think we can all agree with that. There's no room to wiggle around. How can you replace that with some kind of background knowledge about a general concept and say, okay, we're going to push out that whole current state of the art, their selected reference, by something that's background knowledge with no real analysis as to why people would pick that? Dahlen is trying to minimize sequencing. He's not moving to massively parallel sequencing. More to the point, when you add tags, that's more to the sequence. Dahlen wants to sequence one nucleotide, right, a SNP, a polymorphism, so he can figure out is it mother, is it father, do we have an extra, you know, a second one, right? He wants to minimize that. He's going to all these troubles. Why would he add a 12-base tag and massively increase the amount of sequence he has to do when he's trying to reduce sequencing? It's a terrible combination. They had no rationale up through their appeal brief of what you're pulling from where to get there. The board acknowledged that. And with the tagging, it's like, and your tagging argument's terrible because it wouldn't work with the invention because in order to do the test that you're suggesting for Dahlen, you'd have to chop off the tag. And the fact that they have a reference in there that's still trying to do cell-based analysis tells you how far afield they had to go. Final thought? Thank you for traveling to Boston and allowing the law schools to see these kind of arguments, and I very much appreciate your consideration of the matter. Thank you. Thank you. Does CHU do front-end selection of particular chromosome regions to do sequencing on, or does it do some much larger-scale sequencing? I don't know the answer to that. Or what's wrong with that question? I don't know the answer. Well, what's wrong with the question, frankly, is that it's not something that was before the board. And let me actually bring that. I actually meant something, whether there was something technically wrong with the question. No, no, it's a perfectly good question. So I will say the claim is a little ambiguous. Claim one is a little ambiguous on whether it is limited to a particular chromosome. It makes reference to a single chromosome and a reference chromosome, but it also uses the word comprising. So even if CHU covers the entire genome rather than one chromosome, it's not obvious that the claim is limited in a way that would distinguish it from CHU. But let me focus, though, on the language from power integrations that I cited earlier. We have no warrant, this court said, to accept appellate counsel's post hoc rationalizations for agency action. You heard a lot of discussion of the science and Mr. Reines' theory that this was a bad combination of references and the science is different in various respects. You will find none of that in the board's opinion, none. His new theory on this argument that selective enrichment wasn't taught anywhere, that's wrong. The board in its initiation decision found that Schumacher taught selective enrichment. That's A71. Bin Laden taught selective enrichment. That's A1359. But more importantly, it's irrelevant. The board did not make any of the conclusions that Mr. Reines is now offering. The argument that he makes is replete with references to things that the board simply didn't find, and that's not appropriate under Chenery. And I think the appropriate thing for this court to do is to remand and to say, if you are in fact persuaded that this is a bad combination of references and it can't teach us what we need, give us a set of findings that shows us that. But what they have done now is not to pay any attention to the evidence of skill in the art. The Nussbaum declaration was quite clear up front at the initiation of the petition that, quote, multiplexing was so widespread as a technique that the company Illumina offered a commercially available kit for production and analysis of index libraries. This kit enabled the sequencing of 96 different samples on a single flow cell and was designed to be used with their multiplex sequencing platform, the Illumina Genome Analyzer. This is in the record at 876. So as a molecular geneticist in 2008, I would have had the ability to order a commercially available kit for the production of these libraries, which I could have analyzed on a commercially available massively parallel sequencing platform sold by the same vendor. Now, it is simply not the case that this wasn't before the board. It was before the board in the petition. It was before the board because it was cited in their own patent. It was before the board because in their initiation decision, they make affirmative reference to it. To suggest that they can somehow ignore Illumina after the fact by saying it was discussed only in the reply, I think is frankly improper. Thank you. Thank you, Your Honor. We thank both counsel. The case is submitted. And that concludes our proceedings for this morning. All rise. The Honorable Court is adjourned until this afternoon at 2 p.m.